IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BERNARD JACKSON, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. |
| | : | |
| v. | : | JURY TRIAL DEMANDED |
| | : | |
| THOMAS GRENEVICH; | : | |
| SCRUGGS, Corrections Officer; | : | |
| KIRIM, Sargeant; | : | |
| TURNER, Sargeant; | : | |
| DAVID MASCELLINO; | : | |
| JOSEPH TERRA, Superintendent; | : | |
| | : | |
| Defendants. | : | |

## COMPLAINT

### INTRODUCTION

Bernard Jackson was an elderly incarcerated man placed in a cell with a bigger, younger cellmate with a history of past violence with other cellmates. After several incidents where Mr. Jackson's cellmate threatened him, Mr. Jackson asked multiple prison staff for help and to be moved out of the cell. Mr. Jackson's pleas for help were ignored, and his cellmate attacked him, causing a large bloody wound that required eight (8) staples. Mr. Jackson brings claims under the Eighth Amendment to the U.S. Constitution and 42 U.S.C. § 1983 to vindicate his right to be protected from assault while incarcerated.

### JURISDICTION AND VENUE

1. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343(a)(3)–(4).

2. Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to this action occurred in Montgomery County, Pennsylvania, which is in the Eastern District of Pennsylvania.

## PARTIES

3. Plaintiff Bernard Jackson is currently incarcerated in the Pennsylvania Department of Corrections (DOC) at State Correctional Institution (SCI) Phoenix, and at all times relevant to this case was incarcerated at SCI Phoenix.

4. Defendant Thomas Grenevich is employed by the Pennsylvania Department of Corrections as a unit manager. He is sued in his individual capacity.

5. Defendant Scruggs[1] is employed by the Pennsylvania Department of Corrections as a corrections officer. She worked the 6am-2pm shift on Mr. Jackson's unit in the summer of 2024. She is sued in her individual capacity.

6. Defendant Kirim[2] was employed by the Pennsylvania Department of Corrections as a sergeant. He worked the 6am-2pm shift on Mr. Jackson's unit in the summer of 2024. He is sued in his individual capacity.

7. Defendant Turner was employed by the Pennsylvania Department of Corrections as a sergeant. She worked the 2pm-10pm shift on Mr. Jackson's unit in the summer of 2024. She is sued in her individual capacity.

8. Defendant David Mascellino was employed by the Pennsylvania Department of Corrections as a major at SCI Phoenix at all times relevant to this complaint. He is sued in his individual capacity.

---

[1] It is also possible this individual's last name is Scrubbs or Stubbs.
[2] This may not be a correct spelling of this individual's last name.

9. Defendant Joseph Terra is employed by the Pennsylvania Department of Corrections as the Superintendent of SCI Phoenix. He is sued in his official capacity.

## STATEMENT OF FACTS

### An Elderly Man, Mr. Jackson is Repeatedly Put at Risk by His Cell Assignment

10. Mr. Jackson is a 74-year-old veteran who is incarcerated in the DOC.

11. In early 2024, Mr. Jackson was housed on H-block at SCI Phoenix with a much younger cellmate.

12. This cellmate would physically threaten Mr. Jackson by getting very close to his face while arguing.

13. On one occasion, this cellmate rummaged through Mr. Jackson's property, including his legal documents, and threw them on the ground. When Mr. Jackson returned to the cell with a tray of food, this cellmate threw the tray on the ground along with the paperwork.

14. On another occasion, this cellmate pushed Mr. Jackson unprovoked.

15. Mr. Jackson was aware that this cellmate was participating in an anger-management program and had previously assaulted a staff member.

16. Mr. Jackson reported to Mr. Smith, his unit manager, that he feared for his safety with this cellmate.

17. As a result, in May 2024, Mr. Jackson was moved to J-block, where Defendant Grenevich was his unit manager.

18. Unit managers are responsible for making cell assignments.

19. As his unit manager on J-block, Defendant Grenevich was also responsible for evaluating Mr. Jackson and his cellmate to determine if housing them together would pose a risk of harm.

20. Upon information and belief, Defendant Grenevich was aware of the reason Mr. Jackson was being moved to J-block.

21. Mr. Jackson was not interviewed to determine his compatibility with his new cellmate prior to moving to J-block.

22. An evaluation of Mr. Jackson's history would have revealed that he has no violent misconduct history and has not been found guilty of a misconduct at all since 1995.

23. An evaluation of Mr. Jackson's history would also reveal that he has chronic obstructive pulmonary disease (COPD) and asthma, but has regularly been housed with cellmates who smoke, risking his health.

24. On J-block, Mr. Jackson's new cellmate was Alexis Ortiz.

25. At the time, Mr. Ortiz was approximately 36-years-old, while Mr. Jackson was 72.

26. Mr. Jackson is 5 feet and 6 ½ inches tall.

27. Mr. Ortiz was significantly larger than him.

28. Mr. Jackson could not communicate with Mr. Ortiz because Mr. Ortiz primarily spoke Spanish and Mr. Jackson does not know Spanish.

29. In the summer of 2023, Mr. Ortiz had a different cellmate and the two got into several physical fights.

30. During one fight, Mr. Ortiz snuck up behind this prior cellmate and hit him with a lock in a sock.

31. During another fight, Mr. Ortiz broke his prior cellmate's tablet.

32. Mr. Ortiz told his prior cellmate that he was not supposed to have a cellmate because he could not get along with cellmates.

33. Mr. Ortiz told his prior cellmate that he had previously assaulted a cellmate while in county jail.

34. After Mr. Ortiz assaulted his prior cellmate with a lock in a sock, he was moved out of the cell.

35. Mr. Ortiz had approximately three or four more cellmates prior to being housed with Mr. Jackson.

36. Mr. Ortiz had been frequently moved to different cells because of fights and/or arguments with his cellmates.

37. Upon information and belief, Defendant Grenevich was aware of Mr. Ortiz's history and problems with prior cellmates.

## Mr. Jackson's Fears Are Ignored

38. Within a couple of weeks of being housed with Mr. Ortiz, Mr. Jackson began to fear for his safety yet again.

39. Mr. Ortiz would regularly get frustrated with Mr. Jackson, raise his fists, and gesture that he wanted to fight with Mr. Jackson.

40. On a few occasions, Mr. Ortiz grabbed Mr. Jackson by his shirt near his neck.

41. Once, in the middle of the night, Mr. Ortiz got down from his bunk and stared at Mr. Jackson as he put a lock in a sock, which he then took back to his bunk with him.

42. A lock in a sock is commonly used as a weapon in prison.

43. Mr. Jackson gave notice of his fears for his safety to everyone he could.

44. Mr. Jackson spoke to his unit manager, Defendant Grenevich, several times and repeatedly explained that he feared Mr. Ortiz would attack him.

45. On May 31, 2024, Mr. Jackson reported to a psychologist, Dr. Lamar, that he was having difficulty with his cellmate, including that Mr. Ortiz had grabbed him.

46. Dr. Lamar suggested Plaintiff write to Defendant Grenevich to request a Z-Code (a single-cell designation).

47. Mr. Jackson did so and sent copies of this request to Dr. Lamar and his counselor.

48. One day, Mr. Jackson saw Defendant Mascellino, who had previously assisted him with changing cells when he had been threatened by his cellmate on J-block.

49. He told Defendant Mascellino that his current cellmate was threatening him and asked him to speak with Defendant Grenevich regarding Mr. Ortiz.

50. On June 19, 2024, Mr. Jackson completed an Inmate Request to Staff Member form directed to Defendant Grenevich, explaining that Mr. Ortiz had been harassing him by grabbing his shirt near the neck.

51. In his request to Defendant Grenevich, Mr. Jackson explained that he had spoken to Defendant Mascellino and asked Mascellino to speak with Defendant Grenevich regarding changing his cell assignment.

52. Defendant Mascellino outranked Defendant Grenevich and could have directed him to change Mr. Jackson's cell or cellmate.

53. In his written request to Defendant Grenevich, Mr. Jackson asked that Grenevich "quickly investigate and move me or [Mr. Ortiz] before the assaults escalate."

54. Mr. Jackson did not receive a written response, so he spoke to Defendant Grenevich in person, who told him to find his own cellmate.

55. On July 8, 2024, Mr. Jackson wrote to a psychology staff person, Ms. Fernandez, following up on a discussion they had. During this discussion Mr. Jackson explained that he needed

a new cellmate because Mr. Ortiz had repeatedly threatened him by grabbing his shirt and gesturing that he wanted to fight.

56. In his written request, Mr. Jackson asks Ms. Fernandez to speak to Defendant Grenevich about his cell assignment, stating that the current arrangement is not working for several reasons, including Mr. Ortiz's assaults on Mr. Jackson, referring to Mr. Ortiz grabbing him.

57. In his written request, Mr. Jackson also notes that in their discussion, Ms. Fernandez acknowledged the issue of assaults on older incarcerated people.

58. Mr. Jackson also sought assistance from Defendants Kirim and Turner, regularly speaking with them about his concerns regarding Mr. Ortiz.

59. Mr. Jackson reported the incident in which Mr. Ortiz threatened him with a lock in a sock to Defendants Kirim and Turner, as well as telling them that Mr. Ortiz had grabbed him several times.

60. Mr. Jackson also sought help from Defendant Scruggs, repeatedly telling her that Mr. Ortiz was threatening him.

61. Defendants Grenevich, Mascellino, Kirim, Turner, and Scruggs all failed to take reasonable steps to protect Mr. Jackson, despite being aware of the serious risk Mr. Ortiz posed to him.

### **Mr. Ortiz Assaults Mr. Jackson**

62. Early in the morning on July 18, 2024, Mr. Jackson woke up to get his daily medications.

63. In the process of making his bed, Mr. Jackson touched the upper bunk where Mr. Ortiz was sleeping.

64. Mr. Ortiz immediately got angry and Mr. Jackson apologized.

65. In response, Mr. Ortiz slid down to the end of the bunk where Mr. Jackson stood and punched Mr. Jackson in the face.

66. Mr. Jackson immediately pushed the call button, and after a few minutes Defendant Scruggs came over to his cell.

67. Mr. Jackson told Defendant Scruggs that Ortiz had punched him and asked her to get Jackson of the cell.

68. Defendant Scruggs walked away to find a supervisor, leaving Mr. Jackson locked in a cell along with Mr. Ortiz, who had just assaulted him.

69. After Defendant Scruggs left, Mr. Ortiz threw Mr. Jackson's television on the ground and punched the screen, then smashed Mr. Jackson's tablet on the table.

70. Mr. Jackson pushed the call button again and went to the cell door, screaming for a staff member to help him.

71. While Mr. Jackson stood at the cell door, Mr. Ortiz struck him in the back of his head with a lock in a sock, causing a large, bloody wound.

72. Eventually, security staff returned and took Mr. Jackson to the medical department, where they observed a 5-6 cm wound on his head that was oozing red blood and a 4 cm scratch on Mr. Jacksons's right upper back.

73. Mr. Jackson needed 8 staples in his head and had to be admitted to the infirmary for observation overnight.

74. Afterwards, Mr. Jackson was sent to segregation while security conducted an investigation.

**Cell Assignment Process**

75. DOC staff, including Defendants, are aware of the dangers that can arise when people are housed together against their will in a small prison cell.

76. DOC staff, including Defendants, are particularly aware of the dangers posed to older incarcerated people when housed with younger individuals.

77. The DOC promulgated Policy 11.2.1, Reception and Classification, which governs housing procedures.

78. The unit manager is the supervisor of and in charge of overseeing the unit management staff.

79. Policy 11.2.1 requires unit management staff to interview both incarcerated people and review their records "to determine whether there is an imbalance of power between the inmates that could lead to victimization of the weaker inmate."

80. Policy 11.2.1 states that unit management staff should consider a number of factors when considering who should be housed together including: misconducts and prior institutional violence, the number of cell partners, age ("a comparison of both inmates' ages in an effort to cell inmates safely together with inmates that are of similar age"), physical size, and regional differences.

81. Policy 11.2.1 states that unit management staff should make every effort to find two cellmates who agree to be housed together and that involuntary double-celling should be a "last resort."

82. There are additional requirements for involuntary double-celling, including approval by the officer-in-charge where certain concerns exist and seeking input from psychology when the incarcerated person is on the mental health roster.

83. Policy 11.2.1 also emphasizes the importance of the preferences of the incarcerated person in determining who they will be housed with.

84. The designation that an incarcerated person is to be housed alone is called a Z-Code.

85. Policy 11.2.1 lists several factors to consider when evaluating someone for a Z-Code, including certain medical conditions and likelihood of victimization.

86. Based on input from unit management staff and psychology staff, the Superintendent at SCI Phoenix is responsible for determining who gets a Z-Code.

87. The Regional Deputy Secretary must sign off on the Superintendent's decision.

## Ongoing Harm to Mr. Jackson

88. Mr. Jackson continues to experience pain in the location where Mr. Ortiz hit him in the head.

89. He has intermittent head aches and vision problems which began after the assault.

90. The experience of being attacked also worsened Mr. Jackson's post-traumatic stress disorder.

91. He has difficulty sleeping, is more wary of others, and has a heightened awareness of what is happening around him at all times.

92. Mr. Jackson continues to be placed with cellmates who pose a risk of harm to him.

93. In December 2025, after the assault by Ortiz, Mr. Jackson was placed with another cellmate who was again much younger and larger than him. This cellmate also threatened Mr. Jackson. After reporting these threats to his unit manager, Mr. Jackson's cellmate was moved.

94. Mr. Jackson was recently evaluated for a Z-Code and denied by Defendant Terra.

95. Mr. Jackson's current unit manager told him that the unit management and psychology staff recommended he receive a Z-Code and it was Defendant Terra's decision to deny him.

## CAUSES OF ACTION

### COUNT I
### 42 U.S.C. § 1983 – Eighth Amendment Failure to Protect
### Plaintiff v. Defendants Grenevich, Scruggs, Mascellino, Kirim, and Turner

96. The allegations set forth in each of the preceding paragraphs are incorporated herein by reference.

97. Defendants were aware of the substantial risk of serious harm to Plaintiff Bernard Jackson, and they each failed to take reasonable measures to abate it, causing injury to Plaintiff, in violation of the Eighth Amendment.

### COUNT II
### 42 U.S.C. § 1983 – Eighth Amendment Failure to Protect
### Plaintiff v. Defendant Terra

1. The allegations set forth in each of the preceding paragraphs are incorporated herein by reference.

2. Defendant is aware of the ongoing risk of serious harm to Plaintiff Bernard Jackson, and has failed to take reasonable measures to abate it, including denying Plaintiff single-cell status, causing injury to Plaintiff, in violation of the Eighth Amendment.

## REQUESTED RELIEF

WHEREFORE, Plaintiff Bernard Jackson respectfully requests the following relief:

A. An award of appropriate compensatory damages against Defendants in an amount to be determined by the finder of fact;

B. An award of appropriate punitive damages against Defendants in an amount to be determined by the finder of fact;

C. Injunctive relief;

D. Reasonable attorneys' fees and costs; and

E. Such other relief the Court deems just and proper.

Respectfully submitted,

*/s/ Sarah B. Bellos*
Sarah Bleiberg Bellos (PA 327951)
*/s/ Su Ming Yeh*
Su Ming Yeh (PA 95111)
PENNSYLVANIA INSTITUTIONAL LAW PROJECT
718 Arch St., Suite 304S
Philadelphia, PA 19106
215-925-2966
sbellos@pilp.org
smyeh@pilp.org

*Counsel for Plaintiff*

DATED: December 22, 2025